IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

|  |  |  |
|---|---|---|
| ADAM DRUMMOND, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAMDEN COUNTY SHERIFF JIM | ) | |
| PROCTOR, in his personal capacity, | ) | |
| SHERIFF'S CORRECTIONS OFFICER | ) | |
| LARRY PHELPS, in his personal | ) | |
| capacity, SHERIFF'S CORRECTIONS | ) | |
| OFFICER CORPORAL JORDAN | ) | Civil Action File No. 2:22-CV-00033-LGW-BWC |
| MALONE, in his personal capacity, | ) | |
| SHERIFF'S CORRECTIONS | ) | |
| SERGEANT LUIS VALLEJO, in his | ) | |
| personal capacity, SHERIFF'S DEPUTY | ) | |
| MAJOR ROB MASTROIANNI, SR., in | ) | |
| his personal capacity, SHERIFF'S | ) | |
| DEPUTY LIEUTENANT ERIC | ) | |
| WATSON,  in his personal capacity, | ) | |
| SHERIFF'S CORRECTIONS OFFICER | ) | |
| RAKITA DOUGLAS, in her personal | ) | |
| capacity, SHERIFF'S CORRECTIONS | ) | |
| OFFICER KENDALL BENJAMIN, in | ) | |
| her personal capacity,  SHERIFF'S | ) | |
| CORRECTIONS OFFICER WILLIAM | ) | |
| HATFIELD, in his personal capacity. | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS CAMDEN COUNTY SHERIFF JIM
PROCTOR, LARRY PHELPS, JORDAN MALONE, LUIS VALLEJO, ROB
MASTROIANNI, ERIC WATSON, RAKITA DOUGLAS, WILLIAM HATFIELD AND
KENDALL BENJAMIN'S PARTIAL MOTION TO DISMISS**

COMES NOW the Plaintiff, Adam Drummond, through his counsel of record, and

responds to Defendants Camden County Sheriff Jim Proctor, Larry Phelps, Jordan Malone, Luis

Vallejo, Rob Mastroianni, Eric Watson, Rakita Douglas, William Hatfield and Kendall Benjamin's partial Motion to Dismiss as follows:

## I.      INTRODUCTION

This case involves a use-of-force incident, precipitated by an unconstitutional strip search, failure to render medical care, and a subsequent cover-up. Defendants admit that the use-of-force claims have been adequately pled. Defendants' motion to dismiss seeks to dismiss all claims relating to the unconstitutional strip search and failure to render medical care. As detailed below, Defendants' arguments to dismiss these claims fail.

Defendant's motion to dismiss also relates in large part to their efforts to cover-up material facts regarding the incident. Plaintiff's Complaint plausibly alleges that Defendants coerced a false written confession, that they destroyed disciplinary write-ups and notes, and that they altered narratives of the incident report to deflect from their wrongdoing. Their motivation was to protect themselves through avoiding any meaningful oversight. At least one former Camden County Corrections Officer will corroborate these facts under oath. This conspiracy has caused significant harm to Plaintiff's civil claim; the fact that Defendants continue to hold onto the fruits of the conspiracy in this litigation continues to harm Plaintiff's civil claim.

Each Defendant was in a position of significant public trust during these events, and Plaintiff has credibly accused them of intentional breaches of that trust. At the very least, this matter deserves some sunshine. As further argued below, that sunshine is permitted under the law and should happen through discovery.

## II.     SUMMARY OF THE MATERIAL FACTS

In the early morning hours of January 24, 2021, Plaintiff was a pre-trial detainee of the Camden County Sheriff's Office. During that time, Defendants Malone, Phelps, and Vallejo severely beat Plaintiff while in the process of performing a strip search with no known legitimate

penological purpose. (Doc. 35, ¶¶ 15, 36, 87, 89) The strip search violated the policy of the Camden Sheriff's Office, and there was no informal policy to strip search every intake detainee. (Id. at ¶¶ 86, 87) Plaintiff suffered a severe injury from the incident – an inches-long gash, which bled so much that the floor had to be mopped clean, as well as multiple other abrasions to his face and bruises to his body. (Id. at ¶15, 38, 39, 42)

Despite pleading for medical care, not one of the officers on duty called for help, including Defendants Benjamin and Douglas. (Id. at ¶¶ 15, 43, 45, 53) All officers were aware that Plaintiff suffered from a severe gash to his head. (Id.) The following morning, after speaking with Defendant Malone and others, Defendant Hatfield coerced Plaintiff to make a false confession regarding the incident. (Id. at ¶¶ 50, 51, 52)

Corrections Officer Sikes and Defendant Watson reviewed the incident in the following days, determined the strip search and beating violated multiple internal policies, and began the process of disciplining Defendants Malone, Phelps, and Vallejo, including disciplinary write-ups and counseling. (Id. at ¶¶ 57, 58, 60, 61) They brought their conclusions to Defendant Mastroianni. Defendant Mastroianni then directed and assisted in the destruction and alteration of documents relating to Plaintiff's beating for the sole reason that punishing the offended officers would be "admitting to doing wrong." (Id. at ¶65) Defendants Watson, Malone, Phelps, and Vallejo assisted Defendant Mastroianni in the destruction and alteration of documents.  (Id. at ¶¶ 126-127)

## III.   LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the complaint's factual allegations are assumed true and construed in the light most favorable to the plaintiff. Hardy v. Regions Mortg., Inc., 449 F.3d 1357, 1359 (11th Cir. 2006); M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153, 1156 (11th Cir. 2006). The Federal Rules of Civil Procedure include no requirement that a plaintiff detail the facts upon which the plaintiff bases a claim. Rule 8(a)(2) requires a complaint to contain

3

"a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Rodriguez v. Fannie Mae, U.S. Dist. LEXIS 163365, at *6 (N.D. Ga. Oct. 28, 2011)"Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).

## IV.   ARGUMENT AND CITATION TO AUTHORITY

### A.  FOURTH AMENDMENT CLAIMS AGAINST DEFENDANTS MALONE, VALLEJO, AND PHELPS

Plaintiff does not contest that the 11th Circuit has found that a *policy* of strip searching *all* pre-trial detainees as part of the booking process is constitutional. However, those are not the facts of this case. Here, the Camden County Sheriff's Office's policy was to *not* strip search all pre-trial detainees unless there was probable cause that the detainee was hiding contraband. (Doc. 35, ¶¶ 83, 85) Indeed, that was the practice of the individual Defendants as well; Defendants Malone, Vallejo, and Phelps *did not* strip search all pre-trial detainees. (Id. at ¶ 87) Yet they chose to strip search Plaintiff, despite not having probable cause that he possessed contraband.[1] (Id. at ¶83)

Therefore, their individual justifications for initiating the strip search and the circumstances of the strip search are relevant to the question of constitutionality (i.e., whether the search was reasonable and non-abusive under the Fourth Amendment). See Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that prisoners "retain a constitutional right to bodily privacy" that must be evaluated "on a case-by-case basis"); Moton v. Walker, 545 F. App'x 856, 859 (11th Cir. 2013) (finding that strip searches do not violate prisoners' Fourth Amendment privacy rights

---

[1] Notably, Defendants misstate the pleaded facts throughout their argument on this point. Defendants strip search of Plaintiff was not "a routine strip-search of all inmates upon intake." (Doc. 38, p. 9) Paragraph 87 of Plaintiff's Amended Complaint established that Plaintiff's strip search was not routine. (Doc. 35, ¶ 87)

4

in "*as long as* the searches are conducted in a reasonable and non-abusive manner"). Without answering the Complaint, Defendant's subjective justifications for the search cannot be known.

      1.   <u>Plaintiff Has Sufficiently Pled an Unconstitutional Search.</u>

The text of the Fourth Amendment prohibits "unreasonable" searches. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of that particular intrusion, the manner in which it is conducted, *the justification for initiating it*, and the place in which it is conducted." <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979) (emphasis added).

Therefore, for Defendants to overcome their burden to dismiss Plaintiff's Fourth Amendment claims, they must show that the need for the search of Plaintiff outweighed the invasion of his personal rights. Defendants cannot overcome this burden because they had no legitimate need for the strip search. Defendants cannot justify their strip search because it was against policy, there was no probable cause to strip search Plaintiff, and they did not strip search every pre-trial detainee. (Doc. 35, ¶¶ 83-96) Their lack of justification is further evidenced by the fact that they never completed it after the use-of-force incident. (Id. at ¶ 92) Nothing changed before and after the use-of-force incident which could impact the penological justification for the search, but the Defendants never completed the strip search. (Id. at ¶93) In other words, if there was a legitimate purpose for the strip search, one would think Defendants would have completed the search regardless of any intervening act.

Given these facts, a reasonable inference can be drawn that the only reason Defendants decided to strip search Plaintiff was to humiliate, degrade, shame, and embarrass him. (Id. at ¶ 89-

90) This inference is strengthened by the fact that Defendants left the door open and allowed a female to watch the strip search.[2] (Id. at ‖ 82)

Defendants rely heavily on Powell v. Barrett to support their argument of no constitutional violation. (Doc. 20, p. 6) But Defendants ignore critical reasoning in Powell; the defendants in that case could justify the strip searches of *every* prisoner because that was policy. In analyzing Bell, the Powell Court found, "the Court in Bell addressed a strip search policy, not any individual searches conducted under it. The Court spoke categorically about the policy, not specifically about a particular search or an individual inmate." Powell v. Barrett, 541 F.3d 1298, 1306 (11th Cir. 2008) (quoting Bell at 559).  When analyzing the justification for the policy, the Court noted a variety of valid reasons to support a *policy* of strip searching *every* prisoner. Id at 560; see also Rodriguez v. White, 2017 U.S. Dist. LEXIS 217412, at *18 (M.D. Ga. July 27, 2017) (upholding a *policy* on point-of-entry strip searches). Contrary to Defendants' suggestion, the Court in Powell and its progeny did not grant every corrections officer *carte blanche* authority to subjectively make the determination to strip search any prisoner at will, regardless of reasoning.

Here, the fact that Defendants did not strip search every detainee belies the argument that they can rely on the penological justifications as detailed in Powell. Stated another way, Defendants should not receive the benefit of the Bell and Powell defenses because they took the decision to strip search into their own hands, outside of policy and outside of their own common practice. (Doc. 35, ‖‖ 83-96) They did not strip search every pre-trial detainee, but they strip searched Plaintiff. Why? The reasonable inferences, as previously briefed, indicate that there was

---

[2] See Hanners v. Humphries, No. 5:12-CV-245-MTT-CHW, 2012 U.S. Dist. LEXIS 156456, at *4-5 (M.D. Ga. Nov. 1, 2012) (internal citation omitted) ("to state a constitutional claim [under the Fourth Amendment], a prisoner must allege that the strip search in question was not merely a legitimate search conducted in the presence of other inmates and/or female guards, but instead a search conducted in a harassing manner intended to humiliate and inflict psychological pain.")

no legitimate purpose. The reasonable inferences suggest the only purpose was to degrade, humiliate, and shame Plaintiff. (Id. at ₱₱ 82, 89-90) If that was the only purpose, then they violated Plaintiff's Fourth Amendment rights. Defendants should be forced to explain their decision to strip search Plaintiff.

2.   <u>Defendants Violated Plaintiff's Clearly Established Right</u>.

"It is clear that prison inmates retain certain fundamental rights of privacy." <u>Fortner</u>, 983 F.2d at 1029. The Defendants violated Plaintiff's clearly established fundamental right of privacy for two reasons: (1) there was no legitimate penological purpose for the strip search, and (2) the lack of justification combined with the force used to accomplish the search crossed the "hazy border" beyond all objective reasonableness.

First, the constitution is offended by strip searches if they are conducted without legitimate penological purpose. <u>Hanners</u>, 2012 U.S. Dist. LEXIS 156456, at *4. Again, in this case, there is no general policy or even customary practice at issue here. The relevant policies forbid the Defendants from making strip searches unless there was a probable cause. The decision to strip search Plaintiff without probable cause rested solely with the subjective decision-making of the Defendants. Plaintiff has sufficiently pled that Defendants, in fact, had no legitimate penological purpose for his particular strip search. Therefore, the search offended the constitution.

Second, a plaintiff can also show that the contours of a right were clearly established by demonstrating that "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary. This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." <u>Wade v. United States</u>, 13 F.4th 1217, 1226 (U.S. 11th Cir. 2021) (internal

7

citations omitted). The Eleventh Circuit has specifically applied to this reasoning to unreasonable strip searches, holding that when the supposed facts of a case extend well beyond the "hazy border" that sometimes separates law conduct from unlawful conduct, the search was unreasonable.  Evans v. Stephens, 407 F.3d 1272, 1283 (11th Cir. 2005). Reasonableness is assessed in objective terms. Ohio v. Robinette, 519 U.S. 33, 39 (1996).

Here, unlike the defendants in cases where there is a policy to strip search all pre-trial detainees, these Defendants have no objective measures by which to test the reasonableness of their decision to strip search Plaintiff. There was no policy. There was no custom among these individual Defendants. Indeed, the fact that Defendants *violated* internal policy is prima-facie evidence that they should have been aware that this type of subjective decision to strip search, without a penological purpose, violated clearly established law. It is axiomatic that "legitimate penological purpose" should be guiding the principle for all decisions of corrections officers. When corrections officers veer away from that principle, they extend beyond the "hazy border" that sometime separates lawful and unlawful conduct. Plaintiff has sufficiently pled that Defendants performed the strip search on Plaintiff for the sole purpose of humiliating, embarrassing, and degrading him. There is no legitimate penological purpose in that. Defendants should be forced to answer those allegations.

### B.  FOURTEENTH AMENDMENT CLAIM AGAINST BENJAMIN AND DOUGLAS

Prison officials violate the Eighth Amendment (or Fourteenth Amendment in the case of pre-trial detainees) when they act with deliberate indifference to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

1.  Plaintiff's Inches-Long Head Gash Was an Obvious Serious Medical Need.

"A serious medical need is one that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*." Sparks v. Ingle, 724 F. App'x 692, 694 (11th Cir. 2018) (emphasis added). In other words, there are two types of serious medical need, (1) the type requiring diagnosis from a physician, and (2) the type that is obvious to a lay person. "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990). Where defendants concede a serious medical need, "it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves." Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990). "[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990).

Defendants in this case appear to concede that Plaintiff has sufficiently pled a serious medical need. (Doc. 38, p. 10) However, Defendants assume – without arguing – that Plaintiff's serious medical need was not obvious.[3] Defendants' assumption is misplaced. The inches-long open, bleeding wound to Plaintiff's head was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." (see Doc. 35, ⁋ 15)

The opinion of Aldridge v. Montgomery is directly applicable to this point. 753 F.2d 970, 972-73 (11th Cir. 1985). There, during an arrest, the plaintiff sustained a one and a half inch cut below his right eye. Id. at p. 972-973. As a pre-trial detainee, the defendant corrections officers allowed the plaintiff to bleed from that cut for two and a half hours. Id. The plaintiff lost a

---

[3] Defendants imply that Plaintiff's injuries could have been "superficial cuts and abrasions." (Doc. 38, pp. 11-12) The pictures of Plaintiff's injuries speak for themselves.  (Doc. 35, ⁋ 15) No reasonable lay person would ever believe those injuries were "superficial" or minor.

9

significant amount of blood. Id. Under those facts, the 11th Circuit found a cognizable claim for denial for medical care against the corrections officers.  Id.

Here, the facts are far more egregious than those in Aldridge. Here, Plaintiff was subjected to a brutal use-of-force incident. (Doc. 35, ¶ 36) After the use-of-force incident, Plaintiff was bleeding from the head. (Id. ¶¶ 36, 38, 39) He was bleeding so much that his blood pooled on the floor of Room 103. (Id.) The gash on his head was inches long. (Id. at ¶15) After the use-of-force incident, Plaintiff immediately began to complain of headaches and plead for medical attention. (Id. at ¶ 43) His face and head also immediately began swelling. (Id.) Defendants Benjamin and Douglas were on shift during all of this, were aware of these injuries, including the gash to his head and significant bleeding, and they decided not to call for help. (Id. at ¶ 108)

Defendants cite a footnote in Lewis v. Whisenant to support the assertion that, even if the corrections officers were aware of a prisoner's headache, slurred speech, and drooping face, and they failed to render medical care, they still could not be deliberately indifferent. (Doc. 20, pp. 11-12, quoting 2016 U.S. Dist. LEXIS 105079, at *19 n.3 (S.D. Ga. Aug. 9, 2016)). Defendants, however, fail to analyze the 11th Circuit opinion underlying support for that footnote, Walker v. Huntsville. 310 F. App'x 335, 339 (11th Cir. 2009). Walker is more illustrative of the deliberative indifference standard than the Lewis footnote. In Walker, the plaintiff's symptoms (indicating a brain aneurism) were "easily confused with the effects of drugs and alcohol." Id. at 339. In Walker, even a medical professional misdiagnosed the plaintiff's symptoms. Id. The obvious distinctions in this case are (1) the context of the use-of-force incident and (2) the open, bleeding, inches-long gash to Plaintiff's head.

Because the <u>Aldridge</u> Court found that a cut longer than one inch constitutes an obvious serious medical need and the clear distinctions between this case and <u>Walker</u>, Plaintiff has adequately pled that Defendant Benjamin and Douglas were on notice of the need.

      2.  <u>When Read as a Whole, the Allegations State a Claim Against Benjamin and Douglas</u>.

Defendants attempt to surgically dissect Paragraphs 53 and 108 from Plaintiff's Second Amended Complaint, as if those are the only allegations leveled against Benjamin and Douglas in the failure to render medical care claim. (Doc. 20, pp. 11-12) That attempt ignores that all prior paragraphs are incorporated into the claim, specifically including Paragraphs 15, 36, and 38. (Doc. 35, ¶ 97) When Plaintiff alleged that Defendants Benjamin and Douglas were "aware" of his injuries, that means they were aware of the inches-long slice to the head he received from the use of force. It means they were aware that Plaintiff's head bled so much that it required an entire room to be mopped. It means they were aware that the wound continued to bleed well after the use of force. And it means they were aware that his head began to swell after the use of force. Furthermore, with his Second Amended Complaint, Plaintiff specifically alleged that Defendant Benjamin listened while Plaintiff pleaded for medical care, bled profusely from his head and face, and even provided paper towels to help clean the blood from his face. (Id. at ¶ 112-113) Not only that, Defendant Benjamin watched as Defendant Malone had to get a mop and bucket to clean up all the blood that Plaintiff lost in Room 103. (Id. at ¶ 111)

Taken together, these allegations sufficiently state a claim against Defendants Benjamin and Douglas. Because Plaintiff's serious medical need was obvious and Defendants Benjamin and Douglas were aware of that serious medical need, the claims against them should surpass the motion to dismiss standard.

    **C.  CIVIL CONSPIRACY CLAIMS**

1.  <u>Plaintiff Adequately Pled Denial of Access to the Courts and Defendants are Not Entitled to Qualified Immunity.</u>

Despite attempting to offer clarity with his Second Amended Complaint, Defendants still contend that Plaintiff has not been sufficiently specific in his claims for conspiracy. In doing so, Defendants again apparently overlooked Paragraphs 130 and 131 of Plaintiff's Second Amended Complaint. In Paragraph 130, Plaintiff stated, "Defendants' falsification, alteration, and destruction of documents delayed Plaintiff and his counsel from discovering the truth regarding the cause of his injuries, which would form the basis for Plaintiff's claim for redress of the violation of his constitutionally protected rights." (Id. at ¶ 130) In Paragraph 126, Plaintiff stated, "[t]he concealment of these facts led to a delay in Plaintiff instituting this action; these Defendants therefore conspired to deny Plaintiff access the Courts to prosecute his claims." (Id. at ¶ 126) These allegations sufficiently plead a cause of action for conspiracy to deny Plaintiff access to the Courts.

"Covering up the use of excessive force may hinder a criminal defendant's access to the courts to redress a constitutional violation, a right protected by several constitutional provisions." <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1332 (11th Cir. 2008) (citing <u>Chappell v. Rich</u>, 340 F.3d 1279, 1282-83 (11th Cir. 2003) (rights secured by Article IV's Privileges and Immunities Clause, First Amendment, Fifth Amendment, and Fourteenth Amendment)). The Constitution guarantees plaintiffs the right of meaningful access to courts, the denial of which is established when a party covers up evidence. <u>See</u> <u>Delew v. Wagner</u>, 143 F.3d 1219, 1222 (9th Cir.); <u>Swekel v. City of River Rouge</u>, 119 F.3d 1259, 1262 (6th Cir. 1997), cert. denied, 522 U.S. 1047 (1998) ("Several courts have found that a state official's actions in covering-up evidence amounted to a denial of access to the courts.").

"[D]efendants need not literally bar the courthouse door or attack plaintiffs' witnesses. This constitutional right is lost where, as here, police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress. A

contrary interpretation of the right to due process would encourage police officials to conceal the circumstances relating to unlawful [conduct] committed under color of state law and other deprivations of federal rights which Section 1983 was designed to remedy. Thus, interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under 42 U.S.C. §§ 1983."

Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003).

Similarly, a plaintiff's complaint states a claim for wrongful interference with access to the courts where the defendants had concealed evidence and thereby delayed the plaintiffs' filing a cause of action. Miracle by Miracle v. Spooner, 978 F. Supp. 1161, 1173 (N.D. Ga. 1997). Other Circuits agree: Covering up evidence relating to a use-of-force incident is grounds for a denial of access to the courts civil rights claim. "[M]aterial omissions in contemporaneous police reports can reasonably be seen by a jury as evidence that the officers "agreed to abide by [a] claim" about what happened and "agreed to represent [it] falsely." Bell v. City of Milwaukee, 746 F.2d 1205, 1256 (7th Cir. 1984), rev'd on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir. 2005). Omissions specifically as to the infliction of an injury or "reference to the use of force" that indisputably occurred during an arrest "can be as dishonest as an outright lie." United States v. Seymour, 472 F.3d 969, 970 (7th Cir. 2007) (finding the omission, in an arrest report, regarding the use of force against a jaywalker to be material because "[t]he test is whether what is omitted is something the intended reader would have expected to see included if it had occurred . . .").

"[W]here a cover-up of a constitutional deprivation continues during trial, plaintiffs are being denied adequate, effective and meaningful access to the court." Gonsalves v. City of New Bedford, 939 F. Supp. 921, 927 (D. Mass. 1996) (citing Nielsen v. Clayton, 1995 U.S. App. LEXIS 17126, at *1 (7th Cir. July 11, 1995)); see also Connor v. Halifax Hosp. Med. Ctr., 135 F. Supp. 2d 1198, 1224 (M.D. Fla. 2001) (where the Middle District of Florida cites Gonsalves approvingly).

13

Here, Plaintiff has adequately pled a denial-of-access constitutional violation. (Doc. 35, ¶ 130) That claim is based on the Article IV's Privileges and Immunities Clause, First Amendment, Fifth Amendment, and Fourteenth Amendment. (Id, ¶ 128) Importantly, Plaintiff has also adequately alleged damages because Defendants intend to continue the conspiracy through trial. See Gonsalves. Defendants have already alleged that the cover-up was not a conspiracy but simply a jail administrator performing his supervisory duties. (Doc. 38, pp. 14-15) [4] Undoubtedly, Defendants will also attempt to use the coerced written statement, taken by Defendant Hatfield as part of the conspiracy, as an admission against Plaintiff. (Doc. 35, ¶ 127) In Defendants' attempt to use the fruits of their conspiracy in this litigation, Defendants have and are continuing to harm Plaintiff through a denial of access to the courts. In other words, Defendants' use of the fruits of their conspiracy reduces the likelihood of recovery by Plaintiff, and therefore constitutes a denial of access. Because Plaintiff has pled that Defendants have and are continuing to deny him access to the courts, Plaintiff's conspiracy claims should proceed into discovery.

2.   Intra-Corporate Conspiracy Does Not Apply

There are two exceptions to the Intra-Corporate Conspiracy Doctrine. Both apply in this case. First, the criminal conspiracy exception applies because the Defendants each potentially engaged in one or more violations of federal criminal law. Second, the independent personal stake exception applies because each Defendant stood to personally gain from the conspiracy and cover-up of the excessive force.

a.   *The Criminal Conspiracy Exception*

---

[4] Notably, this claim will be directly refuted through the direct testimony of former Corrections Officer Jennie Sikes and others. Further, this claim is refuted by Defendant Mastroianni's admission that the only reason for destroying the disciplinary records and notes was to avoid admitting that "we did something wrong." (Doc. 35, ¶ 154)

The intra-corporate conspiracy doctrine does not apply in this case because of the criminal conspiracy exception to the doctrine. "The Eleventh Circuit has applied a criminal-conspiracy exception to the intra-corporate conspiracy doctrine." Stafford v. Jaggers, No. 1:08-CV-1732-TCB-AJB, 2008 U.S. Dist. LEXIS 127444, at *5 (N.D. Ga. Oct. 7, 2008), citing Farese v. Scherer, 342 F.3d 1223, 1232 n.10 (11th Cir. 2003). "This exception states that the intracorporate-conspiracy doctrine does not apply to alleged intracorporate criminal conspiracies." Farese at 1232 n.10 (11th Cir. 2003). Plaintiff's Complaint has adequately pled a criminal conspiracy.

Misprison of felony, codified under 18 U.S.C. § 4, is one of the several relevant federal crimes applicable in this case ("Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.). In fact, the United States Attorney of the Northern District prosecuted several of these exact type of cover-up cases against corrections officers within the last year. See Department of Justice Press Release No. 22-655, https://www.justice.gov/opa/pr/former-georgia-supervisory-correctional-officer-pleads-guilty-felony-his-role-attempting). Other federal crimes associated with Defendant's conspiracy are (1) 18 U.S.C. § 242 (deprivation of rights under color of law), (2) 18 U.S.C. § 241 (conspiracy against rights), and (3)18 U.S.C. § 1519 (tampering with evidence).

In this case, if the allegations are proven as pled, Defendants Mastroianni and Watson may be guilty of the federal crime of misprison of felony. Much like the corrections officer in the Northern District criminal case, Defendants Mastroianni and Watson assisted in covering up the use-of-force incident instead of properly reporting it. Similarly, Defendants Malone, Vallejo, and

Phelps will be guilty deprivation of rights under color of law (i.e., excessive force). All of them, including Defendant Hatfield, may be guilty of conspiracy against rights and tampering with evidence. Therefore, there was an intra-corporate criminal conspiracy with the Camden County Sheriff's Office, and the intra-corporate doctrine does not apply.

> b. *The Independent Personal Stake Personal Stake Exception*

Another exception to the intra-corporate conspiracy doctrine exists when corporate employees act for their own personal purposes rather than those of their employer. See H & B Equip. Co., Inc. v. Int'l Harvester Co., 577 F.2d 239, 244 (5th Cir. 1978); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (holding that decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding authority in the Eleventh Circuit).

Thus, even assuming that the criminal conduct exception did not apply, the Defendants here would be barred from asserting the intra-corporate conspiracy doctrine because they were not acting solely on behalf of the Camden County Sheriff in conspiring to deprive Plaintiff of his rights. Plaintiff has adequately pled that the Defendants were motivated by their desire to advance their own careers and future financial opportunities. (Doc. 35, ¶¶ 67, 68) Therefore, as pled, the interests of the Defendants in suppressing Plaintiff's ability to pursue a remedy are precisely the type of "independent personal stake" that makes the intra-corporate conspiracy doctrine inapplicable. H & B Equip. Co., 577 F.2d at 244; see also Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir. 1985) (noting that the doctrine is inapplicable where the corporate employees were dominated by personal motives or acting beyond their authority).

Because Plaintiff pled a conspiracy based on a denial of access to the court and because the intra-corporate conspiracy doctrine does not apply, the conspiracy claims against the Defendants should overcome the motion to dismiss.

### D.  FAILURE TO TRAIN, DISCIPLINE, AND SUPERVISE CLAIMS

The inadequacy of police training may serve as the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. City of Canton v. Harris, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05 (1989); Knight Through Kerr v. Miami-Dade County, 856 F.3d 795, 820 (11th Cir. 2017) (A sheriff may be liable for a failure to train deputies "when 'the failure to train amounts to deliberate indifference to the rights of persons with whom the [deputies] come into contact.'") "To establish 'deliberate indifference, a plaintiff must present some evidence that the [sheriff] knew of a need to train . . . in a particular area and the [sheriff] made a deliberate choice not to take any action.'" Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)); Favors v. City of Atlanta, 849 F. App'x 813, 820 (11th Cir. 2021) (where the 11th Circuit overturned summary judgment on a failure to train claim where officers were not trained on a specific area of need). Stated another way, "[s]upervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1308 (11th Cir. 2009)

While a pattern of similar constitutional violations is ordinarily necessary to establish liability for failure to train, that is not always the case. City of Oklahoma City v. Tuttle, 471 U.S. 808, 832 (1985) (Brennan, J., concurring) ("A § 1983 cause of action is as available for the first victim of a policy or custom . . . as it is for the second and subsequent victims; by exposing a municipal defendant to liability on the occurrence of the first incident, it is hoped that future incidents will not occur.")

The facts presented in Vineyard v. Cty. of Murray are similar to those of this case, and this case should warrant a similar result, especially at the motion to dismiss stage. 990 F.2d 1207 (11th Cir. 1993) (where the 11th Circuit upheld a jury verdict on failure to train). There, various sheriff's deputies beat the plaintiff while he was in the hospital. Then, through a series of systemic failures in the sheriff's office, the investigation of the use-of-force incident was not properly investigated or documented. Noting that a single constitutional violation may result in liability where there is "sufficient independent proof that the moving force of the violation was a municipal policy or custom," the Vineyard Court found that a systemic failure to report a use-of-force incident within a sheriff's office supported not only a claim for failure to train, discipline, and supervise, but it supported a verdict. Id. at 1212. Specifically, the 11th Circuit found that "there was sufficient evidence from which the jury could find that [defendants] not having a policy and procedures manual, not requiring the deputies to file an arrest report when beatings or confrontations occur, not logging in or documenting in any way citizens' complaints, and not investigating any complaints together were "the moving force" behind the deputies' "use of gratuitous force." Gold at 1353 (interpreting Vineyard)

    a.   Defendant Mastroianni's Direct Involvement in the Conspiracy to Cover-Up the Use of Force Incident.

Supervisors can be held liable under a failure to train claim when they personally participated in the alleged constitutional violation. Mann, 588 F.3d at 1308. Here, Plaintiff has alleged Defendant Mastroianni's personal involvement in the destruction of documents and evidence relating to Plaintiff's use of force incident. (Doc. 35, ¶¶ 126-127) In fact, part of that conduct included Defendant Mastroianni's actual *failure to discipline and train* officers under his command; he ordered the destruction of write-ups and notes which reflected that Defendants Malone, Phelps, and Vallejo violated policy because those documents would suggest that they "did

something wrong." (Id. at ¶¶ 126-127, 154) The destruction of these documents denied and continue to deny Plaintiff access to the courts, which is a constitutional violation. (Id. at ¶¶ 124-139) Because Defendant Mastroianni was personally involved in the destruction of these documents and evidence and the decision to not discipline officers who commit constitutional violations, the failure to train claim against him should stand.

      b.  <u>Defendant Proctor's Failure to Train, Discipline, and Supervise Defendant Mastroianni</u>

While at the Sheriff's Office, Defendant Mastroianni has been cited for (1) making false statements[5] and (2) supervising a shift which failed to make incident reports on certain cases. In one case, where he was cited for not properly ensuring that incident reports were created, Defendant Mastroianni even argued with a supervisor, stating, "No. I'm going to tell them [to make out incident reports on certain cases]!" [Ex. A, Mastroianni personnel file, pp. 1-4] In addition to those citations, Defendant Mastroianni has two sanctions on his records, each resulting in twenty-four-month probations. [Ex. B, Peace Officer Standard Report] Further, since filing the Motion to Amend (Doc. 22), it has come to undersigned counsel's attention that Defendant Mastroianni was banned from testimony or otherwise found to be uncredible by a judge in the Brunswick Judicial Circuit.[6]

Despite the prior infractions and reputation of Defendant Mastroianni, Defendant Proctor rehired Defendant Mastroianni into the Sheriff's Office and promoted him to the position of Jail Administrator. [Ex. A, pp. 5-6] Defendants Proctor and Mastroianni have worked together for longer than two decades. They were friends before that. [Ex. A, pp. 6-7] It is a reasonable inference that Defendant Proctor knew or should have known of Defendant Mastroianni's past and his willingness to destroy and alter evidence for the sole purpose of avoiding liability. Further it is

---

[5] The records indicate that this citation was later removed, but the matter is worthy of future discovery.
[6] Similarly, Plaintiff has been unable to find the exact circumstances of this incident without discovery powers.

reasonable to infer that other officers knew of Defendant Mastroianni's reputation and contributed to the culture of evasion at the Camden County Jail.

Defendant Proctor's failure to train, discipline, and supervise Mastroianni and the other officers within the jail on this matter was therefore a "moving force" in the cover-up of Plaintiff's incident. The failure to train, discipline, and supervise claims against Defendant Proctor should stand.

    c.   <u>Defendant Proctor and Mastroianni's Failure to Train, Discipline, and Supervise regarding the Use of Excessive Force</u>

The combination of two reasons supports a finding of widespread abuse at the Camden County Jail, which should have put Defendant Proctor on notice for the need of training, discipline, and supervision: a history of other use-of-force incidents, and an open culture of promoting force at the Camden County Jail.

First, Plaintiff is now aware of two prior excessive force incidents involving either the same shift or the same officers who used excessive force against Plaintiff. In the Complaint, Plaintiff alleged the prior incident where pre-trial detainee Castleberry was beaten by the corrections officers on Shift "D", the same shift which used excessive force against Plaintiff. (Doc. 35, ℙ 151) Additionally, since filing the Motion to Amend, undersigned counsel has learned of another excessive force incident, involving Defendants Vallejo and Malone. In the newly learned incident, Defendants Malone and Vallejo allegedly beat a detainee by the name of Singleton while in the Camden County Jail.[7] [Ex. C, Singleton's account of the use-of-force]

Second, a culture existed in the Camden County Jail which promoted using force against detainees. For example, after the use-of-force incident with Plaintiff, Defendants Vallejo, Malone, and Phelps bragged to other officers that they "got another one." (Doc. 35, ℙ 113) Supervisors

---

[7] Notably, Defendants do not address Singleton's incident whatsoever in their response briefing.

cultivated that culture of excessive force in the jail. (Id. at ¶155) In his role as jail administrator, Defendant Mastroianni directed the destruction of incident reports and disciplinary write-ups regarding the use-of-force incident against Plaintiff. Defendant Mastroianni's sole reason for the destruction of these documents was to avoid "admitting" to wrongdoing. (Doc. 22-1, ¶154) Similar to <u>Vineyard</u>, this culture of force at the Camden County Jail was a "moving force" behind the excessive use of force employed against Plaintiff. Therefore, the failure to train, discipline, and supervise claims against Defendant Proctor and Mastroianni should stand.

### E.  OPEN RECORDS ACT CLAIMS

The Georgia Court of Appeals recently permitted private rights of action against public officials who break the Open Records Act. <u>Cardinale v. Keane</u>, 362 Ga. App. 644, 653, 869 S.E.2d 613, 620 (2022). Plaintiff has adequately alleged that Defendant Mastroianni broke the law of the Act. Defendant's response is (1) that Plaintiff did not allege what he requested in the Open Records Request, and (2) even if records were not produced, withhold them was legal because they were not required to be "maintained."

First, contrary to Defendants' assertion, Plaintiff adequately pled what he requested. (Doc 35, ¶156) ("Plaintiff, through undersigned counsel, sent his first open records act request to the Camden County Sheriff's Office on February 4, 2021, ***seeking all documentation potentially relevant to Plaintiff's use-of-force incident***.") (emphasis added) Plaintiff also adequately pled that documents were withheld, contrary to the Act. (Id., ¶¶ 168-170) Second, Defendants completely ignore that Plaintiff alleged Defendant's Mastroianni's sole purpose for not "maintaining" those records was to avoid admitting that "we did something wrong." (Id. at ¶ 154) That is certainly not a legitimate purpose for failing to "maintain" a record under the Act and cannot be a defense to this claim.

V.   <u>**CONCLUSION**</u>

There is no dispute that Plaintiff was subject to a use-of-force incident by Defendants Phelps, Vallejo, and Malone. Defendants Phelps, Vallejo, and Malone precipitated the use-of-force incident with an irregular strip search, which violated the custom of these officers and the policy of the Camden County Jail. Given the photographs of Plaintiff's injuries, there also can be little doubt Plaintiff was severely hurt. Defendants Benjamin and Douglas were aware of Plaintiff's injuries as reflected in those photographs, and they did not call for medical help.

Following that use-of-force incident, Defendants conspired to cover-up critical facts regarding the incident. To start, Defendant Hatfield coerced a false written confession from Plaintiff. Regardless of the false confession, Defendants Phelps, Vallejo, and Malone were written up. However, upon learning of the write-ups, the Camden County Jail Administrator Defendant Mastroianni directed that the disciplinary write-ups and notes be destroyed because they would suggest that "we did something wrong."

Defendants now continue the cover-up conspiracy into this litigation. They will undoubtedly attempt to use the false confession against Plaintiff and attempt to cast their destruction and alteration of documents as "business as usual." It cannot be said that this continuing conspiracy will not harm Plaintiff's access to equal justice under the law. These are public safety officials. They are entrusted to abide by their oaths of office, ***to protect and serve***. In this case, Plaintiff has plausibly pled that Defendants flagrantly breached that public trust. At the very least, these allegations deserve the sunshine of discovery.

The 31st day of August, 2022.

           /s/ *M. Waite Thomas*
           M. Waite Thomas, Esq.
           Georgia State Bar No. 617667
           *Attorney for Plaintiff*

TAYLOR, ODACHOWSKI, SCHMIDT
      & CROSSLAND, LLC
300 Oak Street, Suite 200
St. Simons Island, Georgia 31522
Telephone:     (912) 634-0955
Facsimile:      (912) 638-9739
Email:          wthomas@tosclaw.com

## CERTIFICATE OF SERVICE

This hereby certifies that on this day, I electronically filed the ***Plaintiff's Response to Defendants Camden County Sheriff Jim Proctor, Larry Phelps, Jordan Malone, Luis Vallejo, Rob Mastroianni, Eric Watson, Rakita Douglas, William Hatfield and Kendall Benjamin's Partial Motion to Dismiss*** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Sun S. Choy, Esq.
schoy@fmglaw.com
Wesley C. Jackson, Esq.
wjackson@fmglaw.com
Steven L. Grunberg, Esq.
sgrunberg@fmglaw.com
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948

Adrienne Blair Browning, Esq.
adrienne@tuckerandbrowning.com
Alan David Tucker, Esq.
alan@tuckerandbrowning.com
Riverfront Plaza
4 St. Andrews Court
Brunswick, Georgia 31520

This 31st day of August, 2022.

   /s/ *M. Waite Thomas*
M. Waite Thomas, Esq.
Georgia State Bar No. 617667
*Attorney for Plaintiff*

TAYLOR, ODACHOWSKI, SCHMIDT
   & CROSSLAND, LLC
300 Oak Street, Suite 200
St. Simons Island, Georgia   31522
Phone: (912) 634-0955
Fax:    (912) 638-9739
Email: wthomas@tosclaw.com