# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | |
|---|---|
| ADAM DRUMMOND, | |
|     Plaintiff, | |
|     v. | 2:22-CV-33 |
| JIM PROCTOR, et al., | |
|     Defendants. | |

## ORDER

This matter comes before the Court on Defendants' joint partial motion to dismiss for failure to state a claim for which relief may be granted. Dkt. No. 38. The motion has been fully briefed and is ripe for review. Dkt. Nos. 38, 39, 43. For the reasons stated below, the motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND[1]

On January 24, 2021, at approximately 1:00 a.m., Plaintiff arrived at the Camden County Jail ("Jail") for "intake" after the

---

[1] For purposes of ruling on Defendant's motion to dismiss, the Court takes Plaintiff's version of the facts as true. <u>Am. United Life Ins. Co. v. Martinez</u>, 480 F.3d 1043, 1057 (11th Cir. 2007) ("[W]hen ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true.").

Kingsland Police Department arrested him for driving under the influence ("DUI").   Dkt. No. 35 ¶ 19.   Defendant Corrections Officer Phelps and other corrections officers escorted Plaintiff to the intake area of the Jail.   Id. ¶ 21.   Upon entering the Jail, Plaintiff was pat searched, and no contraband was found on him. Id. ¶¶ 22-23.   Corrections Officer Laurie Brooks met Plaintiff in the intake area to process his arrival, or "book" him, including conducting the "completion questionnaire," noting his medical information.   Id. ¶ 24.   Plaintiff did not want to answer Officer Brooks' questions but was not aggressive or combative in any way. Id. ¶¶ 25-26.   As Defendant Phelps and Officer Brooks were booking Plaintiff, Defendant Corrections Officer Malone came to the intake area and "immediately started escalating the situation with Plaintiff."   Id. ¶¶ 28, 29.   Defendant Malone then "decided to conduct strip search him of Plaintiff [sic]," despite the fact that Plaintiff "did not demonstrate any behavior that would indicate that he possessed contraband, and he had no history of possession [sic] contraband or drugs."   Id. ¶¶ 29, 30.

Officer Brooks then left the intake area and went to the main control room, and Defendant Corrections Officer Vallejo joined Defendant Phelps and Defendant Malone in the intake area.   Id. ¶ 31.   Then, Defendants Phelps, Malone, and Vallejo escorted Plaintiff to Room 103, a room where strip searches are conducted in the Jail.   Id. ¶ 32.   Room 103 does not have any cameras.   Id.

¶ 33.  According to the complaint, at all times while in Room 103, Plaintiff faced away from the three Defendants and "remained non-aggressive."  Id. ¶¶ 34, 35.  Within several minutes of entering Room 103, Defendants Malone, Phelps, and Vallejo severely beat Plaintiff, including beating his head, face, shoulders, and torso. Id. ¶¶ 36–37.[2]  After the incident, Plaintiff's blood pooled on the floor, and the whole floor of Room 103 had to be mopped because there was "so much blood" that "it could not just be wiped up with towels."  Id. ¶¶ 38–39.

Then, Defendants "dragged Plaintiff out of Room 103" and restrained him in the "Pro Restraint Chair."  Id. ¶ 40.  Audio of the minutes following the incident allegedly reflects Plaintiff "immediately and consistently denying touching or using any application of force toward the officers while in Room 103."  Id. ¶ 41.  While Plaintiff was in the Pro Restraint Chair, he continued to bleed from the gashes in his head and face.  Id. ¶ 42.  As Plaintiff's arms and legs were strapped to the Pro Restraint Chair, his face and head began swelling, he developed an extreme headache, and he began pleading for medical attention.  Id. ¶ 43.  Instead of calling an ambulance or a nurse, Defendant Malone told Plaintiff that he was "fine," and Defendant Phelps wiped blood from Plaintiff's face and applied an ACE wrap to the open wound on his

---

[2] Plaintiff's complaint contains photos of his injuries.  See Dkt. No. 35 ¶ 15.

head.  Id. ¶ 44.  Despite Defendants Benjamin and Douglas being on shift in the early morning hours of the date of the incident, they did not prevent or mitigate Plaintiff's injuries.  Id. ¶ 53.

Plaintiff did not see a medical professional until the next morning when he was escorted to the Jail nurse by "Corrections Officers" who refused to leave the medical examination room.  Id. ¶¶ 45-46.  Plaintiff told the Jail nurse that he had a severe headache, light sensitivity, and nausea, but the "Corrections Officers" told the Jail nurse that Plaintiff was "faking."  Id. ¶¶ 47-48.

After Plaintiff saw the Jail nurse, he was able to post bond.  Id. ¶ 49.  According to the complaint, during the outtake process, Defendant Hartfield coerced Plaintiff to make a false written statement that Plaintiff had initiated physical contact against the officers by threating Plaintiff with additional charges and revocation of his bond.  Id. ¶¶ 50-51.  After Plaintiff wrote this false statement, the Sheriff's office released him from the Jail.  Id. ¶ 52.

On January 25, 2021, Corrections Officer Staff Sergeant Jennie Sikes became aware that Defendants Malone, Phelps, and Vallejo implemented use of force tactics against Plaintiff.  Id. ¶ 54.  As Staff Sergeant, Officer Sikes was responsible for the correct implementation of policies amongst Jail Officers, and where necessary, investigating and recommending discipline for

4

policy violations.  Id. ¶ 55.  So, Officer Sikes investigated Plaintiff's use of force incident and saved all necessary video and audio of the incident.  Id. ¶ 56.  Officer Sikes also obtained signed, original versions of Defendants Phelps and Vallejo's incident report narratives, which were authored on January 24, 2021.  Id. ¶ 57.  After reviewing the incident, Officer Sikes concluded that the use of force in Plaintiff's incident was "unnecessary and excessive," and that Defendants Malone, Phelps, and Vallejo violated multiple internal policies.  Id. ¶ 58.

Officer Sikes then presented her conclusions to Defendant Watson, who agreed with her conclusions, and on January 28, 2021, counseled Defendants Malone, Phelps, and Vallejo regarding the incident.  Id. ¶¶ 59-60.  Defendant Watson subsequently advised Officer Sikes "to move forward with preparing write-ups" for Defendants Malone, Phelps, and Vallejo.  Id. ¶ 61.  On February 1, 2021, Officer Sikes "wrote . . . up" Defendants Malone, Phelps, and Vallejo for:

> (1) conduct unbecoming of an officer, (2) failure to follow Strip Search Policy No. 3-2 (failure to establish probable cause for [Plaintiff's] strip search), (3) failure of the "the duty to know", Policy No. 1-2, (4) failure to comply with duty of personal bearing and attention to duty, Policy No. 1-6, (5) dereliction of duty, Policy No. 1-5, (6) failure to observe and give effect to the policies of the office, (7) failure to obey or willful violation of any rule, regulation, or policy of the office, and (8) unnecessary violence toward any person.

Id. ¶ 62.

Officer Sikes then presented the incident investigation and write-ups to her supervisors, Defendants Watson and Mastroianni. Id. ¶ 63. However, Defendant Mastroianni "ordered that no action be taken against the Defendants Vallejo, Malone, and Phelps." Id. ¶ 64. Defendant Mastroianni later told Officer Sikes that Defendants Vallejo, Malone, and Phelps "would not receive punishment because 'punishing them would mean we are admitting to doing wrong,' or something along those lines." Id. ¶ 65. So, all documentation regarding the write-ups was then destroyed, altered, or hidden. Id. ¶ 66. The complaint alleges that Defendants Vallejo, Malone, and Phelps assisted in the destruction, alteration, and hiding of the write-ups "in order to further their careers and future financial opportunities." Id. ¶ 67.

Once Defendant Mastroianni decided to "cover-up the improper use of force," he reviewed the remainder of the incident file to protect himself, the office, and the other officers. Id. ¶ 68. According to the Plaintiff, Defendant Mastroianni was motivated to cover-up the incident "to protect his career, including rank promotions and financial salary raises, and [to] avoid civil liability to [Plaintiff]." Id. ¶ 69. Defendant Mastroianni "marked through the original narratives contained in the incident, edited certain language, and deleted certain language," and then advised Defendant Phelps to implement his changes. Id. ¶ 70. Defendant Phelps complied and edited the original narratives, but

6

neither he nor Defendant Vallejo signed the edited narratives.
Id. ¶¶ 71-72.  Because the original narrative was not included in
the Camden County Sheriff's Office's response to Plaintiff's Open
Records Request, Plaintiff contends it was either "destroyed or
hidden."  Id. ¶ 73.

As a result of the incident, Plaintiff sought medical
treatment and currently has $22,606.07 in medical bills.  Id.
¶¶ 74-75.  Plaintiff was diagnosed with a traumatic brain injury
("TBI").  Id. ¶ 76.  Because of Plaintiff's TBI, he has difficulty
at work, he is unable to socialize, he has severe tinnitus, he has
"an onset of debilitating anxiety," and he has trouble sleeping.
Id. ¶ 77.  As a result of Defendants' willingness "to coerce a
false statement from [Plaintiff] and destroy documents, Plaintiff
[also] suffers from emotional distress, including severe paranoia,
fear of retribution, and nightmares."  Id. ¶ 78.

On April 1, 2022, Plaintiff filed this action.  Dkt. No. 1.
On May 27, 2022, Defendants moved to partially dismiss Plaintiff's
complaint.  Dkt. No. 12.  On June 17, 2022, Plaintiff filed an
amended complaint pursuant to Federal Rule of Civil Procedure
15(a)(1)(B).  Dkt. No. 15.  Because the amended complaint
superseded the original complaint, the Court denied Defendants'
original motion to dismiss as moot.  Dkt. No. 18.  Defendants then
moved to dismiss the amended complaint.  Dkt. No. 20.  Thereafter,
Plaintiff filed a motion to amend pursuant to Federal Rule of Civil

Procedure 15(a)(2), dkt. no. 22, which the Court granted, dkt. no. 34. Plaintiff's second amended complaint includes six claims:

(1) A 42 U.S.C. § 1983 claim against Defendants Vallejo, Malone, and Phelps for violating Plaintiff's Fourth Amendment rights by conducting an unreasonable strip search, dkt. no. 35 ¶¶ 79-96 ("Count I");

(2) A Fourteenth Amendment due process claim against Defendants Vallejo, Malone, Phelps, Benjamin, and Douglas for excessive use of force against Plaintiff, who was, at the time of the incident, a pretrial detainee, id. ¶¶ 97-123 ("Count II");

(3) A 42 U.S.C. § 1983 claim against Defendants Watson, Mastroianni, Phelps, Vallejo, Hatfield, and Malone for conspiring to violate, and violating, Plaintiff's First, Fourth, and Fourteenth Amendment rights, as well as the Article IV Privileges and Immunities Clause, "by tampering with evidence in furtherance of protecting their own criminal and/or tortious behavior, as well as protecting the pecuniary interest of themselves and the Sheriff's Office at Plaintiff's expense," id. ¶¶ 124-39 ("Count III");

(4) A Georgia state-law claim for assault and battery against Defendants Vallejo, Malone, and Phelps, id. ¶¶ 140-49 ("Count IV");

(5)  A failure to train, discipline, and supervise claim

against Defendants Sheriff Proctor and Defendants

Mastroianni, id. ¶¶ 150-66 ("Count V"); and

(6)  A Georgia state-law claim under O.C.G.A. § 50-18-74(a)

against Defendant Mastroianni for violating the

Georgia Open Records Act, id. ¶¶ 167-71 ("Count VI").

Now before the Court is Defendants' partial motion to dismiss
Plaintiff's second amended complaint, which seeks to dismiss
Counts I, II (only as to Defendants Benjamin and Douglas), III, V,
and VI.  Dkt. No. 38.

## LEGAL AUTHORITY

Federal Rule of Civil Procedure 8(a)(2) requires that a
complaint contain a "short and plain statement of the claim showing
that the pleader is entitled to relief."  While this pleading
standard does not require "detailed factual allegations," "labels
and conclusions" or "a formulaic recitation of the elements of a
cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555
(2007)).  In order to withstand a motion to dismiss under Federal
Rule of Civil Procedure 12(b)(6), "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'"  Id. (quoting Twombly, 550
U.S. at 570).  A complaint is plausible on its face when "the
plaintiff pleads factual content that allows the court to draw the

9

reasonable inference that the defendant is liable for the misconduct alleged." Id.

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79.

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (emphasis added)(quoting Fed. R. Civ. Proc. 8(a)(2)).

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set

forth in the complaint.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  The court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Lastly, exhibits attached to pleadings become part of a pleading.  Fed. R. Civ. P. 10(c).  Consequently, a court may consider documents attached to a complaint as exhibits in resolving a motion to dismiss without converting the motion to one for summary judgment.  Taylor v. Appleton, 30 F.3d 1365, 1368 n.3 (11th Cir. 1994).

## DISCUSSION

**A. Defendants are not entitled to qualified immunity on Plaintiff's Fourth Amendment claims**

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Neither party disputes that Defendants performed discretionary functions in this case. Dkt. No. 38 at 5-9 (arguing

that qualified immunity applies); Dkt. No. 39 at 7–8 (arguing that qualified immunity does not apply but not disputing that the officers were performing discretionary functions). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009).

The Supreme Court has recognized a two-step process for analyzing whether qualified immunity adheres. Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). To determine whether qualified immunity protects a defendant, a court examines whether (1) "the officer's conduct amounted to a constitutional violation" and (2) "the right violated was 'clearly established' at the time of the violation." Id. (citing Saucier, 533 U.S. at 201). A court may examine either prong first; "it is . . . not mandated that the Court examine the potential constitutional violation under Saucier step one prior to analyzing whether the right was clearly established under step two." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

**1. Plaintiff plausibly alleged a Fourth Amendment violation.**

Plaintiff alleges that Defendants Malone, Phelps, and Vallejo strip searched him in an unreasonable manner and in violation of Jail policy. The Fourth Amendment permits reasonable, non-abusive strip searches, including body cavity inspections, of detainees,

12

even absent reasonable suspicion that a prisoner is carrying contraband. Bell v. Wolfish, 441 U.S. 520, 558 (1979) (holding policy of routine visual body cavity inspections of inmates whenever they had contact with a person outside of the facility did not violate the Fourth Amendment).

A detainee states a 42 U.S.C. § 1983 Fourth Amendment claim if a strip search was unreasonable, Powell v. Barrett, 541 F.3d 1298, 1305 (11th Cir. 2008), or "if a strip search is 'devoid of penological merit and imposed simply to inflict pain,' or if an inmate alleges that he was 'forced to be naked under circumstances such as a malicious act intended to humiliate the inmate for no legitimate penological reason.'" Weeks v. Grady, No. 1:18-cv-1373-SDG-JKL, 2019 WL 11278455, at *5 (N.D. Ga. Oct. 29, 2019), report and recommendation adopted as modified, No. 118CV01373SDGJKL, 2020 WL 6336186 (N.D. Ga. Oct. 29, 2020), modified on reconsideration, No. 118CV01373SDGJKL, 2021 WL 5564252 (N.D. Ga. Nov. 29, 2021) (first quoting Harris v. Ostrout, 65 F.3d 912, 915-16 (11th Cir. 1995), and then quoting Fatir v. Phelps, No. CV 18-933-CFC, 2019 WL 2162720, at *9 (D. Del. May 17, 2019)). "If strip searches, including bodily cavity inspections, are conducted after a contact visit or upon the inmate's entry to the facility and are handled in a reasonably and non-abusive manner, they do not violate the Fourth Amendment—even if embarrassing and humiliating." Id. (first citing Moton v. Walker, 545 F. App'x 856, 858 (11th Cir.

13

2013); then citing <u>Millhouse v. Arbasak</u>, 373 F. App'x 135, 137 (3d Cir. 2010); then citing <u>Bell</u>, 441 U.S. at 558; and then citing <u>Powell</u>, 541 F.3d at 1314).

Non-abusive searches conducted pursuant to a "policy or practice of strip searching . . . as part of the booking process" likewise do not violate the Fourth Amendment, so long as they "are no more intrusive than those upheld in the <u>Bell</u> case. We also assume, of course, that the searches are not conducted in an abusive manner." <u>Powell</u>, 541 F.3d at 1314; <u>see also</u> <u>Moton</u>, 545 F. App'x at 858-59 (finding that strip searches do not violate prisoners' Fourth Amendment privacy rights "*as long as* the searches are conducted in a reasonable and non-abusive manner").[3] <u>Bell</u> itself acknowledged that "on occasion a security guard may conduct the search in an abusive fashion. Such an abuse cannot be condoned." <u>Bell</u>, 441 U.S. at 560.

Moreover, courts have found that so long as strip searches are carried out for a "legitimate penological purpose," those "searches carried out in non-secluded areas of the prison and in the presence of prison employees of the opposite sex are not unconstitutional." <u>Hanners v. Humphries</u>, No. 5:12-cv-245, 2012 WL 5386149, at *2 (M.D. Ga. Nov. 1, 2012) (first quoting <u>Calhoun v.</u>

---

[3] The policy upheld in <u>Bell</u> "required that searches be conducted on every inmate after each contact visit, even without the slightest cause to suspect that the inmate was concealing contraband." <u>Powell</u>, 541 F.3d at 1306.

DeTella, 319 F.3d 936, 939 (7th Cir. 2003) (citing Johnson v. Phelan, 69 F.3d 144, 150-51 (7th Cir. 1995)) (holding that "[t]here is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners . . . " but that "not every psychological discomfort a prisoner endures amounts to a constitutional violation") ; and then quoting Tasby v. Lynaugh, 123 F. App'x 614, 615 (5th Cir. 2005)).

Plaintiff sufficiently states a claim that the strip search was unreasonable or abusive.  Plaintiff has alleged facts to show that Defendants conducted the search in an abusive manner and had no legitimate penological reason to conduct the search. Specifically, Plaintiff alleges that he had been pat searched upon entering the Jail and no contraband was found on him, that while he "did not want to answer Officer Brooks' questions," he was "not aggressive or combative in any way," and that Defendant Malone "immediately started escalating the situation with Plaintiff . . . and . . . decided to conduct [a] strip search of [him]."  Dkt. No. 35 ¶¶ 25-26, 29.  Plaintiff further alleges that during the strip search, he was facing away from Defendants Vallejo, Phelps, and Malone, that he "remained non-aggressive," but that within several minutes, these three Defendants "severely beat Plaintiff" "in the head and face, as well as shoulders and torso," causing Plaintiff's blood to pool on the floor.  Id. ¶¶ 34-38.  Furthermore, Plaintiff's allegation that Defendants did not complete the strip

15

search after they "severely beat" him adds to the inference that
the strip search lacked a legitimate penological purpose.  Id.
¶¶ 36, 92-93.

True, if all Plaintiff were alleging was that Defendant
Vallejo "deliberately left the door to Room 103 propped open,"
dkt. no. 35 ¶ 82, allowing a female officer to see his strip
search, without more, such an allegation would not amount to a
Fourth Amendment violation.  Hanners, 2012 WL 5386149, at *2.
Likewise, Plaintiff's allegation that Defendants' potential
violation of the Camden County Sheriff's Office's internal
policies, without more, would fail to state a § 1983 claim.  See
Davis v. Pope, No. CV 511-105, 2013 WL 3934209, at *8 (S.D. Ga.
July 30, 2013) ("Section 1983 only provides a remedy for violations
of federal statutes or the federal Constitution, not of internal
policies. A violation of a jail's rules, regulations, and/or
policies, without more, does not give rise to a federal
constitutional violation." (first citing Robinson v. Conner, No.
2:12-CV-397-TMH, 2012 WL 2358955 (M.D. Ala. May 13, 2012) (citing
Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986)); and
then citing Doe v. School Bd. of Broward Cnty., Fla., 604 F.3d
1248, 1265 (11th Cir. 2010) ("[A] § 1983 plaintiff must allege a
specific federal right violated by the defendant."))).
Nevertheless, as noted above, Plaintiff alleged far more than an
open door and a policy violation.

16

Defendants correctly note that courts have upheld policies requiring routine strip searches of arrestees in the booking process. Dkt. No. 38 at 6 (citing Powell, 541 F.3d at 1301 and Bell, 441 U.S. at 558). But Defendants ignore Plaintiff's allegation that Defendants conducted this strip search without a routine strip search policy. See Dkt. No. 35 ¶ 84 ("There is not an internal Camden County Sheriff's Office policy to strip search every intake prisoner for safety."). Finally, Plaintiff's complaint contains allegations that the Defendants' search was abusive—a cornerstone of Bell's rule, regardless of whether a strip search occurs in the booking process. Bell, 441 U.S. at 560; Powell, 541 F.3d at 1314. Therefore, Plaintiff states a plausible claim for relief as to Count I against Defendants Malone, Phelps, and Vallejo.

**2. Plaintiff's rights were clearly established.**

Having plausibly alleged a Fourth Amendment violation, Plaintiff bears the burden of demonstrating that the right was clearly established at the time of the violation. Saucier, 533 U.S. at 201. "To determine 'whether the law clearly established the relevant conduct as a constitutional violation at the time that Defendant Officers engaged in the challenged acts,' the defendants must have had 'fair warning' that their conduct violated a constitutional right." Simmons v. Williams, No. 6:14-CV-111, 2017 WL 3427988, at *30 (S.D. Ga. Aug. 9, 2017), report and

17

recommendation adopted, No. 6:14-CV-111, 2017 WL 4162176 (S.D. Ga. Sept. 20, 2017) (quoting Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (citations and quotation marks omitted)). In this case, the law can be clearly established for qualified immunity purposes only by decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Supreme Court of Georgia. See Fransen, 857 F.3d at 851 ("'Fair warning' comes in the form of binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state . . . that 'make[s] it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law.'" (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000))).

The Eleventh Circuit has recognized three ways a plaintiff can demonstrate a right is clearly established. Id. at 852. First, a plaintiff can present a "materially similar case that has already been decided." Echols v. Lawton, 913 F.3d 1313, 1324 (11th Cir. 2019) (alterations accepted) (quoting Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012)); see also Wade v. United States, 13 F.4th 1217, 1226 (11th Cir. 2021). Second, he can point to "a broader, clearly established principle that should control the novel facts of the situation," which "must establish with 'obvious clarity' that 'in the light of pre-existing law the unlawfulness of the official's conduct is apparent.'" Echols, 913

F.3d at 1324 (first quoting Loftus, 690 F.3d at 1204; and then quoting Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002)). "Because 'fair warning' is the driving force behind a determination that a right has been clearly established, when a plaintiff proceeds in this way, he must show that case [ ] law demonstrated the principle with 'obvious clarity . . . so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" Fransen, 857 F.3d at 852 (citing Loftus, 690 F.3d at 1205 (internal quotation marks omitted)). "The violation of a right may also fall into this category when '[t]he reasoning, though not the holding of prior cases . . . send[s] the same message to reasonable officers in novel factual situations.'" Id. (citing Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)).

Third, Plaintiff can show the law is clearly established where "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." Echols, 913 F.3d at 1324 (alteration accepted) (quoting Loftus, 690 F.3d at 1205). This third category is "narrow" and includes only those situations where the "official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official." Id. at 1325 (quoting Loftus, 690 at 1205). These three

pathways are not mutually exclusive; rather, one officer's conduct could theoretically satisfy two, or even three, categories at once. Regardless of which pathway the plaintiff seeks to satisfy, the "salient question" qualified immunity seeks to answer is "whether the state of the law at the time of an official's conduct provided fair warning to every reasonable official" that the official's conduct in the specific context of the case "clearly violates the Constitution." Id. at 1324 (alterations accepted) (internal quotation marks omitted).

While relevant precedent exists, there is no materially similar binding case involving the same factual scenario Plaintiff alleges here. Defendants insist that the Eleventh Circuit's application of Powell in Watkins v. Pinnock, 802 F. App'x 450 (11th Cir. 2020) extends Powell to all circumstances where an allegedly unconstitutional strip search is conducted in the absence of a policy requiring routine strip searches of all inmates. Dkt. No. 43 at 2-3. That argument is misplaced. First, it is well-established that unpublished cases like Watkins do not serve as binding precedent and cannot be relied upon to define clearly established law. J.W. v. Birmingham Bd. of Educ., 904 F.3d 1248, 1260 n.1 (11th Cir. 2018). Second, Powell held that non-abusive searches conducted pursuant to a "policy or practice of strip searching . . . as part of the booking process" do not violate the Fourth Amendment, so long as they "are no more intrusive than those

upheld in the Bell case." Powell, 541 F.3d at 1314. Powell did not address strip searches conducted in the absence of a routine strip-search policy, as Defendants suggest. Regardless, Plaintiff's allegations in this case are distinguishable from those in Watkins, particularly where Watkins involved an inmate who "had been singing a song with violent and threatening lyrics, and . . . he had been arguing" with officers when being escorted to the jail. Watkins, 802 F. App'x at 456. To the contrary, Plaintiff alleges only that he did not want to answer Officer Brooks' questions, not that he had used "violent and threatening" language toward her or "been arguing" with officers. Dkt. No. 35 ¶¶ 25-26.

On the other hand, Plaintiff's reliance on Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005) as a purportedly materially similar case, is also misplaced. In Evans, the court held that the manner in which an officer conducted a post-arrest evidentiary strip search inside a broom closet at the jail, after both plaintiffs had undergone two pat-downs, constituted an obvious violation of plaintiffs' right to be free from unreasonable searches. Id. at 1280, 1283. The Evans plaintiffs alleged that during the search the officer forced plaintiffs to undress, assaulted them, struck one of them with a baton, and then used the same baton-like object to penetrate their anuses and lift their genitals, while laughing and using racist and threatening language. Id. at 1276-77.

21

Indeed, as Defendants point out, the conduct in Evans is more egregious than the conduct alleged here.  Dkt. No. 43 at 4.

Because there is no materially similar binding case involving the same factual scenario Plaintiff alleges here, the Court must determine whether existing "caselaw demonstrate[s] the [unconstitutionality of Defendants' actions] with 'obvious clarity . . . so that every objectively reasonable government official . . . would [have] know[n] that the official's conduct did violate federal law when the official acted.'"  Fransen, 857 F.3d at 851 (quoting Loftus, 690 F.3d at 1205 (citation and internal quotation marks omitted)).

Defendants correctly note that a routine strip-search of all intake inmates does not violate the Constitution.  No. 43 at 6 (citing Powell, 541 F.3d at 1301 and Bell, 441 U.S. at 558).  However, Defendants ignore Plaintiff's main allegation—abusive strip searches cannot be condoned—which is supported by case law since Bell.  See Powell, 541 F.3d at 1314.  While Bell and Powell address routine strip-search policies, both cases emphasize that a basic component of a *constitutional* strip search is that it *not be abusive*.  Id. at 1301, 1305-06, 1314; Bell 441 U.S. at 560.

Moreover, the court's reasoning in Evans was predicated on Bell's pronouncement that jail officers "cannot properly conduct strip searches . . . in 'an abusive fashion.'"  Evans, 407 F.3d at 1281 (quoting Bell, 441 U.S. at 560).  So, even disregarding the

22

larger factual differences between Evans and the present case, the Evans court emphasized that "[t]he physical aspects of the searches [were] also disturbing. Unnecessary force was used. Evans was thrown into Jordan, causing both men to collapse. As Jordan tried to stand back up, Officers Stephens hit him with a baton-like object." Id. While Defendants' alleged abuse of Plaintiff in the present case does not directly mirror the abuse of the Evans plaintiffs under the materially similar case requirement, Bell's non-abusive strip-search principle is a rule of law applicable to both under the second pathway of the clearly established law inquiry.

Furthermore, Bell's non-abusive search principle was not only applied in Evans but reiterated in other cases within this circuit. See Powell, 541 F.3d at 1314; see also May v. City of Nahunta, 846 F.3d 1320, 1325-26, 1331-32 (11th Cir. 2017) (holding it is clearly established that officer's use of forcible language and threat of deadly force to compel a female citizen to disrobe in front of a male officer with whom she was locked in a room for twenty minutes was unreasonable "[g]iven our prior holding that searches performed in an 'abusive fashion' may violate the Constitution" (citing Evans, 407 F.3d at 1281)).   It is obvious that any reasonable officer would know that subjecting a "non-aggressive" Plaintiff to a strip-search, dkt. no. 35 ¶ 35, "severely beat[ing]" him, id. ¶ 36, and never actually completing that strip search,

id. ¶ 92, after Plaintiff had already been pat-searched and did not show signs of possessing contraband or drugs, id. ¶¶ 22, 23, 26, 30, is a violation of his clearly established right to not be subject to an "abusive" strip-search. Bell, 441 U.S. at 560. Thus, Defendants Malone, Phelps, and Vallejo are not entitled to qualified immunity on Plaintiff's Fourth Amendment claim at this time.

## B. Plaintiff's claims for deliberate indifference against Defendants Benjamin and Douglas

To state a claim for deliberate indifference to a serious medical need, Plaintiff "must show: (1) the prisoner had a serious medical need; (2) the defendant acted with deliberate indifference to the prisoner's serious medical need; and (3) the defendant's wrongful conduct caused the prisoner's injury." Davison v. Nicolou, No. CV-616-039, 2016 WL 6404034, at *3 (S.D. Ga. Oct. 27, 2016) (citing Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)).[4]

---

[4] Claims of deliberate indifference to the serious medical needs of pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause, rather than by the Eighth Amendment's Cruel and Unusual Punishment Clause (which applies to duly sentenced prisoners). Andujar v. Rodriguez, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007); Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.19 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002) (collecting cases). But the standard for assessing these claims is the same under either amendment. Hill, 40 F.3d at 1185 n.19; Andujar, 486 F.3d at 1203 n.3.

**1. Serious Medical Need**

Defendants do not dispute that the "gashes" to Plaintiff's "head and face," and eventual brain injury, qualify as an objectively serious medical need.  Dkt. No. 35 ¶¶ 42, 76; Dkt No. 38 at 10.  A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (quoting Hill, 40 F.3d at 1187).  "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

**2. Deliberate Indifference**

Having sufficiently plead that Plaintiff had an objectively serious medical need, he "must satisfy [a] *subjective* component by showing that the prison official[s] acted with deliberate indifference to h[is] serious medical need." Goebert, 510 F.3d at 1326 (emphasis added).  And, if Plaintiff succeeds in that step, he must show that each defendant's wrongful conduct caused the constitutional injury.  Id.

The subjective knowledge prong of a deliberate indifference claim requires each Defendant to be "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." Farmer

25

v. Brennan, 511 U.S. 825, 837 (1994). However, deliberate indifference does not include "an official's failure to alleviate a significant risk that he should have perceived but did not." Id. at 838. Rather, the defendant "must have actually perceived the medical need." Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1292 (S.D. Ga. 2013). "Whether a particular defendant has subjective knowledge . . . is a question of fact[,] 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Goebert, 510 F.3d at 1327 (quoting Farmer, 511 U.S. at 842).

Likewise, "[d]isregard of the risk is also a question of fact that can be shown by the standard methods." Id. It requires Plaintiff to sufficiently plead that each Defendant "disregarded [the substantial] risk by failing to take reasonable measures to abate it." Keele, 983 F. Supp. 2d at 1292 (alteration accepted) (quoting Farmer, 511 U.S. at 847). So, even if a given defendant "actually knew of a substantial risk to a prisoner's health and the resulting harm was not ultimately averted, no liability [attaches] if the defendant responded reasonably to the perceived risk." Davison, 2016 WL 6404034, at *4 (citing Keele, 938 F. Supp. 2d at 1292).

Plaintiff must also sufficiently plead that each Defendant's conduct constituted "more than gross negligence." Id. at *5. "The meaning of 'more than gross negligence' is not self-evident but past decisions have developed the concept." Goebert, 510 F.3d at 1237. "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). Moreover, "delay[ing] necessary treatment for non-medical reasons," or "knowingly interfer[ing] with a physician's prescribed course of treatment" may amount to deliberate indifference. Id. "In cases that turn on the delay in providing medical care, rather than the type of medical care provided . . . [or] [w]here the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert, 510 F.3d at 1237.

Finally, Plaintiff must sufficiently plead a "causal connection" between each Defendant and the constitutional injury. Id. Causation "can be shown by personal participation in the constitutional violation." Id. Further, "[w]hether a particular defendant was subjectively deliberately indifferent is a unique inquiry as to each individual." Keele, 938 F. Supp. 2d at 1293

27

(citing Presley v. City of Blackshear, 650 F. Supp. 2d 1307, 1315 (S.D. Ga. Dec. 31, 2008)); see also Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.").  So, the Court separately analyzes whether each Defendant was deliberately indifferent to Plaintiff's needs.  See Burnette, 533 F.3d at 1331 ("Each individual Defendant must be judged separately and on the basis of what that person [knew].").

### i.  **Plaintiff fails to state a claim against Defendant Douglas.**

Plaintiff has not specifically alleged that Defendant Douglas was subjectively aware of the substantial risk of serious harm to have had a "sufficiently culpable state of mind" let alone that she failed to act despite that knowledge.  Wilson v. Seiter, 501 U.S. 294, 297 (1991).  Instead, the complaint includes only conclusory allegations that Defendant Douglas, alongside the other defendants, was "on shift" and "aware" of Plaintiff's injuries but "decided to not call for medical care," and thus, was "deliberately indifferent to Plaintiff's medical needs."  Dkt. No. 35 ¶¶ 53, 108, 114-17; see also Iqbal, 556 U.S. at 680-81 (finding Iqbal's allegation that officials "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate

28

penological interest,'" was conclusory and thus insufficient to establish discriminatory intent (alterations in original)).

Plaintiff has not alleged facts to show that Defendant Douglas heard or saw anything regarding Plaintiff's use-of-force incident or resulting injuries, that she saw Plaintiff's "blood pooled on the floor," that she had any interaction with Plaintiff during his time at the Jail, or that she had knowledge of Plaintiff's injuries. Dkt. No. 35 ¶ 38. Rather, Plaintiff relies on conclusory statements regarding deliberate indifference attributed to other Defendants but includes none specifically addressing Defendant Douglas's own knowledge. Dkt. No. 39 at 11 (citing dkt. no. 35 ¶ 97, which incorporates all prior paragraphs of the complaint into Count II); Iqbal, 566 U.S. at 679; Burnette, 533 F.3d at 1331. Thus, Defendants' motion to dismiss the deliberate indifference claim against Defendant Douglas is **GRANTED**.

## ii.  Plaintiff adequately alleges deliberate indifference against Defendant Benjamin.

As for Defendant Benjamin, Plaintiff's allegations are sufficient. On a motion to dismiss, the Court must "draw[] all reasonable inferences in the plaintiff's favor." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). Despite Defendants' insistence otherwise, Plaintiff alleges not only that Defendant Benjamin was "on shift" and "aware" of Plaintiff's injuries, but also that she "listened as Plaintiff pleaded for medical care and

29

complain [sic] of severe headaches," "ignored his complaints, despite knowing that Defendant Malone had to get a mop and bucket to clean up all the blood he lost during the use of force incident," and "watched blood stream down his face, watched his head swell, and did nothing other than pass paper towels to Defendants Malone and Vallejo to wipe away the blood." Dkt. No. 35 ¶¶ 53, 108, 110-12.  Defendants' argument that Plaintiff "makes no allegation as to what type of interaction he had with [Defendant Benjamin] (if any), what symptoms he presented when interacting with [Defendant Benjamin], whether he requested medical care from [Defendant Benjamin], whether [Defendant Benjamin] understood that his injuries were more than superficial cuts and abrasions, etc.," is simply inaccurate.  Dkt. No. 38 at 11.  Thus, Defendants' motion to dismiss the deliberate indifference claim against Defendant Benjamin is **DENIED.**

## C. Defendants are entitled to qualified immunity on Plaintiff's 42 § U.S.C. 1983 conspiracy claims.

"To state a claim for conspiracy under § 1983, a plaintiff must allege that (1) the defendants reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights; and (2) the conspiracy resulted in an actual denial of one of his constitutional rights." Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1327 (11th Cir. 2015).

In Count III, Plaintiff asserts that Defendants Watson, Mastroianni, Phelps, Vallejo, Hatfield, and Malone conspired to cover up the Fourth Amendment violations alleged in Count I. Dkt. No. 35 ¶¶ 124-39. Plaintiff alleges that the conspiracy resulted in the deprivation of his constitutional right to access to the courts under the First, Fourth, and Fourteenth Amendments, as well as the Article IV Privileges and Immunities Clause. Id. ¶ 128. Defendants contend they are entitled to qualified immunity. Dkt. No. 38 at 14-15.

At the motion to dismiss stage, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." Keating, 598 F.3d at 760 (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson, 555 U.S. at 231 (alteration in original) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

Defendants have met their initial burden of showing that they were acting within the scope of their discretionary authority at the time the alleged violations occurred. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (2003)). A defendant acts within his discretionary authority if he

"perform[s] a legitimate job-related function" through means "within his power to utilize." Id. at 1265; see also Howard v. Gee, 538 F. App'x 884, 887 (11th Cir. 2013) ("To determine that we ask: (1) whether the official was performing a function that, 'but for the alleged constitutional infirmity,' would have fallen within his 'legitimate job description'; and (2) whether that function was carried out 'through means that were within his power to utilize.'" (quoting Holloman, 370 F.3d at 1265-66)).

Here, Plaintiff's claims arise from Defendants' writing of incident forms, record keeping, gathering witness statements, and verbally discussing incidents. Dkt. No. 35 ¶¶ 126, 130-31. The Court finds, and Plaintiff does not dispute, that these acts necessarily fall within Defendants' duties as jail officers. See Howard, 538 F. App'x at 887 ("[The officer's] job was to supervise inmates, maintain jail security, and fill out incident reports as necessary. He was acting within his authority when attempting to detain [the plaintiff] and reporting the incident."). Because Defendants have shown they were acting within the scope of their discretionary authority, Plaintiff must show that "the officer[s'] conduct amounted to a constitutional violation" and "the right violated was 'clearly established' at the time of the violation." Lewis, 561 F.3d at 1291 (citing Saucier, 533 U.S. at 201).

Though Plaintiff attempts to assert a denial-of-access-to-the-courts claim, he fails to allege sufficient facts to establish a constitutional violation occurred.

"Access to the courts is clearly a constitutional right, grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." Chappell v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003) (first citing Christopher v. Harbury, 536 U.S. 403, 415 n.12 (2002) (noting the Supreme Court's past reliance on all these bases); and then citing Bank of Jackson Cnty. v. Cherry, 980 F.2d 1362, 1370 (11th Cir. 1993) (grounding the right of access to courts in the First Amendment)). In Chappell, the Eleventh Circuit recognized that "interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under 42 U.S.C. § 1983." Id. at 1283. The court, quoting a Seventh Circuit case, explained,

> that to deny access to the courts, defendants need not literally bar the courthouse door or attack plaintiffs' witnesses. This constitutional right is lost where, as here, police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress. A contrary interpretation of the right to due process would encourage police officials to conceal the circumstances relating to unlawful killings committed under color of state law and other deprivations of federal rights which Section 1983 was designed to remedy.

Id. (quoting Bell v. City of Milwaukee, 746 F.2d 1205, 1261 (7th Cir. 1984), overruled on other grounds, Russ v. Watts, 414 F.3d 783, 788 (7th Cir. 2005)).

"To have standing to seek relief under this right, however, a plaintiff must show actual injury by 'demonstrat[ing] that a nonfrivolous legal claim ha[s] been frustrated or . . . impeded.'" Jackson v. State Bd. of Pardons & Paroles, 331 F.3d 790, 797 (11th Cir. 2003) (alterations in original) (quoting Lewis v. Casey, 518 U.S. 343, 353 (1996) (discussing actual injury requirement to sustain a claim for denial of access to the courts)).  However, an allegation of *delay* of access to the courts, without more, is insufficient to state an actual harm or injury.  See Miracle by Miracle v. Spooner, 978 F. Supp. 1161, 1172-73 (N.D. Ga. 1997) ("Every court that has applied Lewis has held that a plaintiff must show, for example, that the defendant prevented him from bringing some non-frivolous claim or that, for some reason owing to state action, a court dismissed the plaintiff's claim because he failed to satisfy some technical requirement." (collecting cases)); see also City of Milwaukee, 746 F.2d at 1261 (defendants' concealment of evidence of facts that were central to plaintiff's state wrongful death action which was subsequently dismissed); Ryland v. Shapiro, 708 F.2d 967, 974-75 (5th Cir. 1983) (defendants' concealment of evidence which prevented plaintiffs

from filing a state wrongful death action within the statute of limitations); Lewis, 518 U.S. at 351 ("[T]he inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.").

Here, Plaintiff fails to plead an actual injury. For example, Plaintiff has neither alleged nor argued that the alleged conspiracy caused his underlying Fourth Amendment claims to be rejected, that it prevented him from bringing his Fourth Amendment claims, or, for that matter, that it impeded or frustrated any other claim. Plaintiff alleges only that "Defendants' falsification, alteration, and destruction of documents *delayed* Plaintiff and his counsel from discovering the truth regarding the cause of his injuries, which would form the basis for Plaintiff's claim for redress of the violation of his constitutionally protected rights," dkt. no. 35 ¶ 130 (emphasis added), and that the "concealment of these facts led to a delay in Plaintiff

35

instituting this action," id. ¶ 131.   These allegations are
insufficient to state an injury for a denial-of-access claim.
Accordingly, Plaintiff fails to properly plead that the
"conspiracy resulted in an actual denial of" Plaintiff's access to
the courts.   Weiland, 792 F.3d at 1327.   Having found no
constitutional violation, the Court need not address whether the
right was "clearly established" at the time.   Pearson, 555 U.S. at
236.   Thus, Plaintiff's claim must be dismissed.

However, it is not lost on the Court that this alleged
conspiracy, if true, could result in other potential hurdles for
Plaintiff in *proving* his alleged Fourth Amendment violations at a
later stage of the case.   See e.g., Gonsalves v. City of New
Bedford, 939 F. Supp. 921, 925–27 (D. Mass. 1996) (noting § 1983
provides a remedy for denial of access claims if the defendant's
actions are "ca[us]ally connected to a plaintiff's failure to
succeed in her lawsuit," and describing the effect of an alleged
cover-up in the context of an on-going civil rights suit, noting
the cover-up "caused the jury's inability to decide who [was]
responsible for the constitutional violations which were proven
and, therefore, injured the plaintiff by depriving her of the
damage award she would have otherwise received").

Construing these facts in a light most favorable to Plaintiff,
it is reasonable to infer an agreement between these officers to

conceal the facts of the underlying Fourth Amendment violations, thereby preventing his discovery of critical evidence to support his claims.  Thus, this claim is **dismissed without prejudice** at this time.

## D. Plaintiff fails to allege failure to train, discipline, and supervise claims against Defendants Proctor and Mastroianni

To state a § 1983 claim, Plaintiff must allege that "a person" acting under color of state law deprived him of a right secured under the United States Constitution or federal law.  42 U.S.C. § 1983.  It is well-established that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'"  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994)).  Instead, supervisory liability under § 1983 arises when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  Figures v. Gordon, No. 22-12121, 2023 WL 352707, at *2 (11th Cir. 2023) (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010)).

A causal connection can be shown in three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights," or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone, 326 F.3d at 1360 (internal quotation marks omitted) (citations omitted). A "policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Goebert, 510 F.3d at 1332 (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)). "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." Id. (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). "Demonstrating a policy or custom requires 'show[ing] a persistent and wide-spread practice.'" Id. (quoting Depew v. City of St. Mary's, 787 F.2d 1496, 1499 (11th Cir. 1986)). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Hartley, 193 F.3d at

1269 (quoting <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990)).  Moreover, "[a] plaintiff can only allege the existence of a policy or custom by 'point[ing] to multiple incidents or multiple reports of prior misconduct by a particular employee.'" <u>Henley v. Payne</u>, 945 F.3d 1320, 1331 (11th Cir. 2019) (alteration in original) (quoting <u>Piazza v. Jefferson Cnty.</u>, 923 F.3d 947, 957 (11th Cir. 2019)).  This is an "extremely rigorous" standard.  <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1308 (11th Cir. 2009) (quoting <u>Braddy v. Fla. Dep't of Labor & Emp. Sec.</u>, 133 F.3d 797, 802 (11th Cir. 1998)).

**1. Claims Against Defendant Proctor**

Plaintiff does not allege that Sheriff Proctor personally participated in the alleged use-of-force incident or the subsequent cover-up.  Instead, Plaintiff seemingly alleges there is a causal connection between Defendant Proctor's alleged failure to train, discipline, and supervise and (1) the alleged use-of-force incident, and (2) Defendant Mastroianni's alleged conspiracy to deny Plaintiff access to the courts.  Dkt. No. 35 ¶¶ 150-66.

However, Plaintiff fails to sufficiently allege a causal connection.  He makes no allegation that Defendant Proctor directed the use of force against Plaintiff or knew Defendants Malone, Phelps, and Vallejo would use force against Plaintiff and failed to stop them from doing so.  Plaintiff makes no allegation that

Defendant Proctor had knowledge of Defendants Malone, Phelps, and Vallejo's use of excessive force in this incident or that he had knowledge of these Defendants' widespread history or custom of using excessive force toward detainees.  Plaintiff's allegation that "there was [sic] culture of deliberately not disciplining or correcting Camden Sheriff's officers who perpetuated Constitutional violations against detainees" is wholly conclusory. Dkt. No. 35 ¶ 155.  Nor does Plaintiff allege Defendant Proctor's knowledge of this "culture."   Id.   Instead, Plaintiff makes allegations *regarding Defendant Mastroianni's actions*, for example, Defendant Mastroianni's alleged destruction of personnel write ups, id. ¶ 153, "cover[]-up" of policy violations, id. ¶ 154, and "consistent[] fail[ure] to make incident reports," id. ¶ 158.

Plaintiff insists that instances of Defendant Mastroianni's behavior, which he summarizes as "making false statements and creating a culture wherein his subordinates are encouraged to not report incidents" would somehow put Defendant Proctor on notice that Defendants Malone, Phelps, and Vallejo were likely to engage in a strip search where they allegedly used excessive force and that these Defendants contribute to a "widespread issue of excessive force."   Dkt. No. 35 ¶ 162; Id. ¶¶ 160-61 (stating "[k]nowing this history and pattern, Defendant Sheriff Proctor promoted Defendant Mastroianni to the role of Jail Administrator"

40

after describing *Defendant Mastroianni*'s "pattern of making false statements and creating a culture wherein his subordinates are encouraged to not report incidents"); Id. ¶ 162 (stating in a conclusory fashion, "Defendant Sheriff Proctor was aware of or should have been aware of the widespread issue of excessive force being employed at the Camden County Jail, including the aforementioned culture, and he failed to implement any changes to the training, discipline, or supervision policy."). Plaintiff alleges that because Defendant Mastroianni "has worked for the Camden County Sheriff's Office for longer than two decades, much of (sic) time working with Defendant Sheriff Proctor, who is also a personal friend" and because of Defendant Mastroianni's other alleged behavior having to do with incident reports, Sheriff Proctor was on notice of and failed to correct a widespread history of use of excessive force tactics during strip searches employed by Camden County Jail officers. Id. ¶¶ 156–62.

While Plaintiff does allege one prior use of force incident against an inmate named "Castleberry," he does not allege what happened, who participated, or whether Defendant Proctor knew of this incident. Id. ¶ 151. A single incident of a constitutional violation, without more, "is insufficient to prove a policy or custom even when the incident involves several [subordinates.]" Craig v. Floyd Cnty., 643 F.3d 1306, 1311 (11th Cir. 2011).

Further, through his brief, Plaintiff attempts to amend his complaint to show Defendant Proctor's notice of another prior incident. Plaintiff states, "since filing the Motion to Amend, undersigned counsel has learned of another excessive force incident, involving Defendants Vallejo and Malone . . . allegedly beat[ing] a detainee by the name of Singleton." Dkt. No. 39 at 20. However, this attempt to amend is improper. See Williams v. Williams, No. CV614-011, 2014 WL 4187530, at *3 (S.D. Ga. Aug. 20, 2014) ("Plaintiff did not make this allegation in his Complaint, and his attempt to amend his Complaint at this stage of the proceedings is improper. 'Motions to dismiss brought pursuant to Rule 12(b)(6) test the sufficiency of the factual allegations contained in the complaint, and "a party may not rely on new facts in submissions in response to a motion to dismiss to defeat the motion."'" (quoting Erb v. Advantage Sales & Mkt., LLC, No. 6:11-cv-2629, 2012 WL 3260446, at *3 (N.D. Ala. Aug. 3, 2012))).

Even if the Court were to consider these new "allegations," Plaintiff still fails to plausibly allege that Defendant Proctor was on notice of a "history of widespread abuse" which he failed to correct or a "custom or policy" resulting in deliberate indifference, particularly where Plaintiff fails to allege that Defendant Proctor knew of the "new" incident involving "Singleton." Dkt. No. 39 at 20. Thus, Plaintiff fails to

42

sufficiently allege Defendant Proctor knew of Defendants Malone, Phelps, and Vallejo's use of excessive force during strip searches such that he would be in the position to rectify this conduct by further training or supervision but failed to do so.

Plaintiff's allegations that Defendant Mastroianni's conduct evinces a failure to train, discipline or supervise by Defendant Proctor similarly fails.  Most of Plaintiff's allegations in this regard refer to Defendant Mastroianni's destruction of personnel write-ups from violations of the Jail's use of force policy, dkt. no. 35 ¶¶ 152–153, his failure to take disciplinary action, id. ¶ 153-54, his cover-ups of Jail policy violations, id. ¶ 154, and his prior discipline for "making a false statement and for insubordination," id. ¶ 157.  None of Plaintiff's allegations describe Defendant Proctor's knowledge of these instances.  And even if they did, Plaintiff still fails to plausibly allege an underlying constitutional violation.  To the contrary, Plaintiff's allegations regarding *Mastroianni* show only violations of Jail policy or insubordination, not use of excessive force.  While there is no doubt that Mastroianni's alleged conduct is concerning, such conduct does not, by itself, amount to constitutional violations of which Defendant Proctor knew and failed to correct.

Moreover, as discussed supra, Plaintiff also fails to sufficiently allege an underlying constitutional violation

regarding Defendant Mastroianni's purported conspiracy to deny Plaintiff access to the courts.

Thus, Plaintiff's claim that Defendant Proctor failed to train, discipline, and supervise Defendants Vallejo, Malone, Phelps, and Mastroianni must fail because Plaintiff has alleged neither a causal connection nor a constitutional deprivation. Mann, 588 F.3d at 1308. Accordingly, Plaintiff's failure to train, discipline, and supervise claims against Defendant Proctor are **DISMISSED.**

### 2. Claims Against Defendant Mastroianni

Plaintiff's claims against Defendant Mastroianni similarly fail. Plaintiff does not allege that Defendant Mastroianni participated in the use-of-force incident, only that there is a causal connection between Defendant Mastroianni's conduct and the alleged use-of-force incident.

Plaintiff does not allege that Defendant Mastroianni directed Defendants Malone, Phelps, and Vallejo to use excessive force during their strip search of Plaintiff. Nor does he allege that Defendant Mastroianni knew of any prior incident involving Defendants Malone, Phelps, and Vallejo's use of excessive force during the strip search of a detainee. Dkt. No. 35 ¶ 151 (alleging an incident pertaining to another detainee named "Castleberry" but not alleging Defendant Mastroianni knew of this incident nor that

44

he participated in or directed it).  Again, while Plaintiff mentions a new incident involving "Singleton" in his brief, he does not allege anything regarding "Singleton" in his *complaint*, nor does he even argue that Defendant Mastroianni had notice of that incident.  Dkt. No. 39 at 20; Williams, 2014 WL 4187530, at *3.

Plaintiff does allege, however, that Defendant Mastroianni was aware of Defendants Malone, Phelps, and Valejo's use of excessive force in the incident at issue here.  Dkt. No. 35 ¶ 152. Plaintiff further alleges that Defendant Mastroianni was not only aware of Plaintiff's use-of-force incident but made efforts to cover it up and that he has done so in the past with other incident reports to avoid admitting "that we did something wrong."  Id. ¶¶ 153–54.  But this single incident is insufficient to establish a "widespread history" of using excessive force toward detainees on the part of Defendants Malone, Phelps, and Vallejo.  It also does not show a "custom" or "policy" of using excessive force toward detainees on Defendant Mastroianni's part.  Further, Plaintiff's reference to an "Employee Warning Report" showing one failure to complete an incident report, dkt. no. 39-1, does not establish "an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." Goebert, 510 F.3d at 1332.

45

At most, Plaintiff alleges Defendant Mastroianni contributed to a "culture of deliberately not disciplining or correcting Camden Sheriff's officers who perpetuated Constitutional violations against detainees." Id. ¶ 155.  But Plaintiff fails to allege Defendant Mastroianni's notice—constructive or otherwise—of any excessive use of force incidents involving Defendants Malone, Phelps, and Vallejo aside from his own.  Again, while there is no doubt that these allegations are concerning, they do not meet Plaintiff's "extremely rigorous" burden here.  Mann, 588 F.3d at 1308 (quoting Braddy, 133 F.3d at 802).

Moreover, while Plaintiff has alleged Defendant Mastroianni's direct involvement in the alleged cover-up of the use of force incident, as discussed supra, Plaintiff fails to sufficiently allege an underlying constitutional violation regarding Defendant Mastroianni's alleged conspiracy to deny Plaintiff access to the courts.  Thus, to that end, there can be no causal connection to any constitutional violation because one has not been alleged.

Plaintiff's failure to train, discipline, and supervise claims against Defendant Mastroianni are **DISMISSED**.

**E. Plaintiff sufficiently alleges a Georgia Open Records Act claim**

O.C.G.A. § 50-18-70 et seq. ("Georgia Open Records Act" or the "Act"), states "[a]ll public records shall be open for personal inspection and copying, except those which by order of a court of

46

this state or by law are specifically exempted from disclosure."
O.C.G.A. § 50-18-71(a). Requested records must be timely produced
as provided by state law. O.C.G.A. § 50-18-71(b)(1)(A). The Act
further provides, "[a]ny person or entity knowingly and willfully
violating the provisions of this article by failing or refusing to
provide access to records not subject to exemption from this
article, by knowingly and willingly failing or refusing to provide
access to such records within the time limits set forth in this
article, or by knowingly and willingly frustrating or attempting
to frustrate the access to records by intentionally making records
difficult to obtain or review," is subject to civil and criminal
liability. O.C.G.A. § 50-18-74(a).

The Act further provides, "a civil penalty may be imposed by
the court in any civil action brought pursuant to this article
against any person who negligently violates the terms of this
article in an amount not to exceed $1,000.00 for the first
violation. A civil penalty or criminal fine not to exceed $2,500.00
per violation may be imposed for each additional violation that
the violator commits within a 12 month period from the date the
first penalty or fine was imposed." Id. The Georgia Open Records
Act allows "private plaintiffs to seek civil penalties for
violations of the act." Cardinale v. Keane, 869 S.E.2d 613, 617
(Ga. Ct. App. 2022). "Public record" is defined as "all documents,

47

papers, letters, maps, books, tapes, photographs, computer based or generated information, data, data fields, or similar material prepared and maintained or received by an agency or by a private person or entity in the performance of a service or function for or on behalf of an agency or when such documents have been transferred to a private person or entity by an agency for storage or future governmental use."   O.C.G.A. § 50-18-70(b)(2).

Plaintiff adequately states a claim under the Georgia Open Records Act.   While Defendants insist that Plaintiff "does not sufficiently allege (a) what specifically [P]laintiff requested in his open records request or (b) what was actually produced," dkt. no. 38 at 23, the allegations in the complaint identify that Plaintiff requested "all documentation potentially relevant to Plaintiff's use-of-force incident," and that Defendants never provided "(1) the original incident report, (2) the use of force report, and (3) the personnel write ups of [Defendants] Vallejo, Phelps, and Malone."  Dkt. No. 35 ¶¶ 168, 170.  Defendant correctly notes that Plaintiff alleges he received *some* documents in response to his open records request.  See Id. ¶¶ 169-70 (describing that Defendant Mastroianni ordered the production of only the "materially altered/edited Incident Report and the false, the coerced written statement, and in [sic] operable video footage," and that Defendants "never supplement that response").  Further,

48

Plaintiff's allegations do sufficiently describe what was requested, produced, and omitted. Id. ¶¶ 168-70. Plaintiff's allegations of the records that were omitted, namely "(1) the original incident report, (2) the use of force report, and (3) the personnel write ups of [Defendants] Vallejo, Phelps, and Malone," are sufficient to state a claim under the Act. Id. ¶ 170.

Moreover, Defendants' argument that the requested documents are not "records" within the scope of the Act because the write-ups and reports "never became the official write-ups or reports of the jail," and because Defendant Mastroianni "declined to issue" these documents "as he had the final authority" to do so, is premature at this stage in the proceedings. Accordingly, Defendants' motion to dismiss Plaintiff's Open Records Act claim is **DENIED.**

**CONCLUSION**

For these reasons, Defendants' partial motion to dismiss, dkt. no. 38, is **GRANTED** as to Count III (§ 1983 conspiracy claims against Defendants Watson, Mastroianni, Vallejo, Hatfield, and Malone) and Count V (federal failure to train, discipline, and supervise claim against Defendants Proctor and Mastroianni), as well as to Count II (Fourteenth Amendment due process claim) against Defendant Douglas. The motion is **DENIED** as to Count I (§ 1983 claims against Defendants Vallejo, Phelps, and Malone),

Count VI (Georgia Open Records Act claims), and Count II (Fourteenth Amendment due process claim) against Defendant Benjamin.  Count I (§ 1983 claims against Defendants Vallejo, Phelps, and Malone), Count II (Fourteenth Amendment due process claims against Defendants Vallejo, Malone, Phelps, and Benjamin), Count IV (Georgia state law assault and battery claims against Defendants Vallejo, Malone, and Phelps), and Count VI (Georgia Open Records Act claims against Defendant Mastroianni) remain pending.

**SO ORDERED** this 20th day of March, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA